Melvin SLAUGHTER, Plaintiff-
Respondent,

v.

Orval MYERS, Defendant-Appellant.

No. 47696.

Supreme Court of Missouri.

Division No. 1.

April 11, 1960.

Motion for Rehearing or to Transfer to
Court en Banc Denied May 9, 1960.

Opinion Modified on Court's Own Motion
May 9, 1960.

Donald P. Thomasson, Jackson & Thomasson, Jackson, Powell & Jones, Dexter, for plaintiff-respondent.

Blanton & Blanton, Sikeston, for defendant-appellant.

HYDE, Presiding Judge.

Action for damages for personal injuries sustained in an intersection collision of two automobiles. Plaintiff had verdict and judgment for $10,000 and defendant has appealed.

Plaintiff submitted on failure to yield right of way, failure to keep a lookout to the right and excessive speed. Defendant contends that plaintiff failed to make a jury case claiming that his evidence shows he was guilty of contributory negligence as a matter of law. Therefore, we will consider the evidence from the viewpoint most favorable to plaintiff in ruling this issue. The collision occurred about 5:15 P.M., October 10, 1957, in the city of Dexter at the intersection of Mulberry Street, a north and south street, and Truitt Street, an east and west street. Plaintiff was driving west on Truitt and defendant was driving north on Mulberry. The pavement on Truitt was 16 feet wide, with shoulders about nine feet wide; there was no obstruction on the north shoulder of Truitt. The pavement on Mulberry was 19 feet wide but there was a ditch about two feet deep on the east side of the pavement that was bridged over by the sidewalk at the southeast corner of the intersection; and there was also a fire plug, a concrete street marker post and a utility pole at that corner. (The ditch did not go north of the intersection but went east on the south side of Truitt.) There was a house on that corner, 15 to 18 feet from each of the two streets, facing on Mulberry. Mulberry ran from the north end of Dexter to the south end, crossing Highway 60, and was one of the main thoroughfares of the city; but there were no stop signs at this intersection. There was no evidence as to the amount of traffic on either street but plaintiff often drove on Truitt to go to his daughter's home.

As plaintiff drove west on Truitt he saw two children in the street near the middle of the block east of Mulberry and slowed almost to a stop for them to get across the street. He said he "pulled it down in low and then slipped it on up in second" attaining a speed of from 15 to 20 miles per hour but as he approached the intersection got down to 10 miles per hour. He said he looked south about 30 or 35 feet before he got to the intersection and could see from 90 to 100 feet south; and seeing no cars approaching he looked north. Plaintiff then looked straight ahead and started across, on the right (north) side of Truitt.

at 10 miles per hour in second gear. Plaintiff never saw defendant's car and said the last thing he remembered, before waking up in the hospital, was getting into the intersection when "something just like to blew me up." Plaintiff said his car was in good condition with good brakes and tires and that he could have stopped his car at 10 miles per hour in five feet, which of course did not include reaction time, but that he did not apply his brakes after he passed the children. Plaintiff's wife, who was riding with plaintiff, also said their speed was about 10 miles per hour going into the intersection. She said she saw nothing coming from the south when they entered the intersection but when "out about middleways" she saw "a car coming into us" which she judged was coming "around 35 or 40 miles an hour." She said when she first saw defendant's car "it was about the length of two cars back" not yet in the intersection; and that defendant seemed to be "on his brakes" and turning. Plaintiff's car was struck on the left side between the front wheel and the door. After the collision, plaintiff's car came in contact with a utility pole on the west side of Mulberry, north of Truitt, with sufficient force to break the pole in two. Debris of the impact was located in the center of the intersection and scattered to the northwest from there.

Plaintiff also had the testimony of a State Highway Patrolman that in his investigation of the collision, he saw defendant unconscious at the hospital and smelled alcohol on his breath; he stated that it smelled like beer. (Defendant testified that he had one bottle of beer.) A witness who saw defendant's car go by his house on Mulberry (the second house south of the intersection) estimated its speed at 40 miles per hour. It was also shown that the speed limit in Dexter except on state highways was 25 miles per hour.

Defendant had the testimony of two women who saw him pass on Mulberry, about the middle of the block south of the intersection, estimating his speed at about 25 miles per hour. A patrolman found skid marks of defendant's car extending from 19 feet south of the center of the intersection, turning northwest to his car, which stopped over the sidewalk on the north side of Truitt, on the northwest corner of the intersection. There were no skid marks from plaintiff's car. The patrolman said he checked sight distances, finding that from 35 feet east of the center of Mulberry he could see all the way to Highway 60, one block south of the intersection; and that 35 feet east of the east sidewalk on Mulberry he could see 210 feet south. Defendant testified that his speed was 25 miles per hour when he passed the two women in the middle of the block and that he remembered nothing after that until he woke up in the hospital.

Defendant says plaintiff must be held negligent as a matter of law on the grounds (1) that he failed to stop his car prior to the point of impact when, by his own testimony, he could have done so; (2) that he failed to turn his car to the right onto the north shoulder of Truitt or the east shoulder of Mulberry when, by his own testimony, he could have done so; (3) and that he failed to look to his left as he approached and entered the intersection when he could have seen defendant's car so close as to constitute an immediate hazard of a collision. Of course, plaintiff would not have taken either of the first two suggested actions unless he had looked to the left a second time before entering the intersection. Therefore, the decisive question is not what plaintiff could have done if he had looked again and seen defendant approaching but whether he was negligent (failed to exercise the highest degree of care) in failing to look.

Defendant cites cases like Yeaman v. Storms, 358 Mo. 774, 217 S.W.2d 495, and Claridge v. Anzolone, 359 Mo. 65, 220 S.W.2d 33, in which the plaintiff saw the close approach of the defendant's car but continued to cross in front of it leaving to the defendant to take action to avoid

a collision. Defendant also cites cases like Douglas v. Whitledge, Mo.App., 302 S.W. 2d 294; James v. Berry, Mo.App., 301 S.W. 2d 530; and Roux v. Pettus, Mo.App., 293 S.W.2d 144, in which the plaintiff failed to see the defendant's car closely approaching in plain view. We think this case is more like Burke v. Renick, Mo.App., 249 S.W.2d 513, 516, in which it was shown the plaintiff looked south 15 to 20 feet before reaching the intersection where he could see 60 feet south of the intersection; he then looked north and ahead and did not look south again until he had entered the intersection. It was held that "this gave him the right to assume that there was no immediate danger from the left, for it was not necessary for him to anticipate the approach of a vehicle from the south at an unlawful rate of speed"; and that "since it was his duty to look in both directions, as well as to look ahead, and since it is an impossibility for a person to perform all three acts at once, it was not contributory negligence as a matter of law for Randell to fail to look continually to the south." See also Hoppe, Inc. v. St. Louis Public Service Co., Mo. App., 227 S.W.2d 499, 502, ruling on this point adopted 361 Mo. 402, 235 S.W.2d 347, 23 A.L.R.2d 846; Barnes v. Vandergrift, 364 Mo. 829, 269 S.W.2d 13; Cooksey v. Ace Cab Co., Mo.Sup., 289 S.W.2d 40; Moore v. Southwestern Bell Telephone Co., Mo.Sup., 301 S.W.2d 817. As plaintiff pointed out, after he entered the intersection it was too late for him to stop short of the point of collision. Even if he could have stopped in five feet braking distance, at his speed of 10 miles per hour, he would have proceeded about 11 feet during the usually assumed ¾ seconds' reaction time or a total distance of 16 feet; and if he then had turned away (northwardly) from defendant's car after entering the intersection he would have still been within its path. Considering that plaintiff did look when he could see a distance farther south than a car moving within the lawful speed limit could have traveled before he would

have cleared the intersection, we cannot say that he was negligent as a matter of law. Plaintiff's evidence, both by estimates of witnesses and the results of the collision, showed that defendant was traveling at an excessive speed. Furthermore, plaintiff's evidence as to the speed of each car, as well as the oral testimony as to which entered first, shows that plaintiff's car was in the intersection first. See Sec. 304.021, RSMo, V.A.M.S. Although the right to proceed on reaching an intersection first is not absolute and depends on the circumstances (Wilson v. Toliver, 365 Mo. 640, 285 S.W.2d 575), nevertheless it would not be negligence as a matter of law for plaintiff to assume that any northbound traffic would yield him the right of way after he had looked far enough south to see any car that could have reached the intersection before he did, if traveling at lawful speed, and saw there was none within that distance. Defendant's car was not then within that distance if it was traveling at the speed indicated by plaintiff's evidence. We, therefore, hold that the court properly submitted the issue of contributory negligence to the jury.

Defendant also claims error in giving Instruction P–2 at plaintiff's request and this contention must be sustained. The first paragraph of this instruction was as follows: "The Court instructs the jury that under the law of Missouri a motorist who approaches an intersection is under a duty to exercise the highest degree of care to watch and keep a lookout for vehicles approaching such intersection from his right, and to see what is plainly visible, and a failure to do so constitutes negligence as a matter of law."

This instruction then hypothesized the factual situation not in dispute (direction of streets and course of the parties) and then continued: "[A]nd if you further find that defendant failed to exercise the highest degree of care to keep a lookout for vehicles approaching said intersection from

his right, if so, and as a direct result of such failure on defendant's part, he drove his automobile into collision with plaintiff's automobile in said intersection, if so, and you further find that plaintiff was injured as a direct result of such failure, and that plaintiff was at all times exercising the highest degree of care for his own safety, if so, then you are instructed that your verdict will be for plaintiff."

■ This statement in the first paragraph of P–2 was erroneous and in conflict with the first paragraph of Instruction D–2, given at the request of defendant to submit plaintiff's contributory negligence as a defense, which was as follows: "The Court instructs the jury that it is the duty of a motorist entering an intersection to exercise the highest degree of care in the operation of the car he is driving, and to maintain a careful and vigilant lookout ahead and laterally, and to see what a person in the exercise of the highest degree of care for the safety of himself and others would be expected to see under similar circumstances."

■ Furthermore, it was not correct to say that a failure to keep a lookout to the right constitutes negligence as a matter of law. We have just held, as plaintiff insisted, that his failure to keep a lookout to the left was not negligence as a matter of law because a driver cannot keep a lookout in all directions at once; and certainly he must not keep his lookout in one direction only. What constitutes negligence in failing to keep a lookout in any direction at any particular time or place depends on the conditions and circumstances and usually is a jury question. 5A Am.Jur. 392–394, Secs. 265–266; 60 C.J.S. Motor Vehicles § 284, p. 661; 61 C.J.S. Motor Vehicles § 526, p. 437. We must hold this instruction prejudicial for several reasons. In the first place, it had the effect of telling the jury that defendant was negligent as a matter of law just because there was a collision

when he had evidence that he had not exceeded the speed limit and that plaintiff had been negligent in the matter of lookout. See lookout instruction approved in Anderson v. Bell, Mo.Sup., 303 S.W.2d 93, 97, set out in Raymond's Missouri Instructions 1959 Pocket Part 105, Sec. 1196.2. Plaintiff had no direct evidence concerning lookout by defendant, who did not remember anything about it because he had a skull fracture, and it would seem that defendant was not where he could have seen plaintiff's car when he was in the middle of the block south, the last place he remembered. Furthermore, this instruction carried the implication that plaintiff performed his full duty as to lookout if he kept a lookout to the right and thus it excused his failure to look again to the left, before entering the intersection, which the jury could have found was negligence.

■■ Defendant also claims error in Instruction P–6 as injecting the issue of contributory negligence into the submission of his counterclaim based on humanitarian negligence and says that this conflicts with his Instruction D–3 submitting that issue. The first sentence of Instruction P–6 was as follows: "The Court instructs the jury that under the law of this state it was the duty of both the plaintiff and the defendant to use the highest degree of care in the driving and operating of the automobiles which they were driving and operating at the time mentioned in the evidence." This instruction then defined the terms "negligence" and "highest degree of care." Instruction D–3 told the jury that if they found the facts hypothesized therein (which would establish humanitarian negligence) "then it would be your duty to return a verdict in favor of the defendant and against the plaintiff on the defendant's counterclaim, even though you should further find from the evidence that the defendant was himself negligent in getting into or becoming in such position of imminent peril." In Banks v. Koogler, Mo.Sup., 291 S.W.2d 883,

890, we said: "Failure to make specific reference in the instructions on primary negligence to the defendant's humanitarian submission may or may not result in the instructions being in conflict depending on how the instructions are otherwise worded." We held the instructions in that case were not in conflict because "a finding for plaintiff based on his primary negligence instructions necessarily precluded a finding for defendant based on his instruction submitting humanitarian negligence, and vice versa," so that "they did not authorize contributory negligence on the part of defendant to be considered as a defense to defendant's submission of humanitarian negligence." See also Hangge v. Umbright, Mo.Sup., 119 S.W.2d 382, 383. Our conclusion is that for these same reasons there is no conflict between Instructions P–6 and D–3 in this case. As held in the Banks case, the express wording of Instruction D–3 specifically precluded consideration of contributory negligence on the part of defendant as a defense to the humanitarian negligence charge. Moreover, Instruction P–6 was not a verdict directing instruction, as were instructions complained of in the Banks case; and certainly the abstract statement therein about duty to use the highest degree of care was not a specific direction to consider such duty in determining defendant's humanitarian submission. We therefore hold there was no error in the submission of defendant's counterclaim and, since Sec. 512.160, subd. 3, RSMo, V.A.M.S., provides "no new trial shall be ordered as to issues in which no error appears," the verdict of the jury in favor of plaintiff and against defendant on defendant's counterclaim must be held to be final. Therefore, on remand new trial herein shall be on plaintiff's claim against defendant only.

The judgment is reversed and the cause remanded.

All concur.